UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  09/15/2016

-------------------------------------------------------------------X

UNITED STATES SECURITIES AND                    :
EXCHANGE COMMISSION,                            :
                                                :
                                    Plaintiff,  :              1:15-cv-7035-GHW
                                                :
            -v -                                :         MEMORANDUM OPINION
                                                :              AND ORDER
EDWARD DIMARIA and MATTHEW GAMSEY, :
                                                :
                                   Defendants.  :
-------------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

        The United States Securities and Exchange Commission (the "SEC") alleges that Defendants

Edward DiMaria and Matthew Gamsey orchestrated and executed a scheme to artificially inflate

Bankrate, Inc.'s ("Bankrate") revenues and understate expenses, so that Bankrate would meet certain

financial targets in the second quarter of 2012.  DiMaria and Gamsey (together, "Defendants") have

each moved to dismiss the amended complaint, arguing that the allegedly improper accounting

entries were not material and that the SEC has failed to plead scienter.  For the following reasons,

Defendants' motions are denied, with one exception:  Gamsey's motion to dismiss the claim against

him under § 17(a)(2) of the Securities Act of 1933 is granted.

I.      BACKGROUND[1]

        Bankrate aggregates and provides personal finance information on a variety of topics

through its website, Bankrate.com.  Amended Complaint ("AC") ¶ 16, ECF No. 40.  During the

relevant time period, Bankrate had three primary divisions:  Bankrate Core ("Core"), Bankrate

Insurance ("Insurance"), and Bankrate Credit Cards ("Credit Cards").  AC ¶ 17.  DiMaria was

Bankrate's chief financial officer, and Gamsey was the vice president and director of accounting.

---

[1] Unless otherwise noted, the facts are taken from the amended complaint, and are accepted as true for the purposes of
this Rule 12(b)(6) motion.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet
that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

AC ¶ 1.  Gamsey, who became a certified public accountant in 2001, was Bankrate's primary liason with its auditor.  AC ¶ 15.

*Bankrate's Corporate Culture Prior to the Second Quarter of 2012*

Prior to the accounting entries at issue in this action, DiMaria is alleged to have "fostered a corporate culture . . . that condoned using improper accounting techniques to achieve financial targets."  AC ¶ 19.  Bankrate carried over-accrued expense accounts—which were referred to as "Ed's cushion"—on its books, and DiMaria would use these accounts to "tune" Brankrate's numbers to meet financial targets.  AC ¶¶ 20-21.

In one instance, in the first quarter of 2012, DiMaria instructed Bankrate's vice president of finance to book audit fees to an improper account.  AC ¶ 22.  DiMaria's email instructions said "I don't care if they complain, we can say it was a mistake," and when the vice president of finance forwarded the email to Gamsey he described it as "[a]nother Ed special."  *Id.*  Several months later, when Bankrate's auditor asked about this accounting entry, Gamsey said that the fees had been mistakenly booked as deal costs despite the fact that he knew that DiMaria had ordered that the fees be booked that way.  AC ¶ 23.

In another instance, after reviewing the May 2012 financial results, DiMaria directed Bankrate employees to "book like $150 in rev[enue] to EBITDA in May . . . [p]lus reverse $75 in accruals."  AC ¶ 24.  DiMaria's email said the adjustments were necessary because he had told the chairman of Bankrate's board that the company would meet certain financial targets, and the original financial results were below those target figures.  *Id.*  DiMaria instructed the recipients of his email to "keep it under the radar."  *Id.*

Bankrate announced its first quarter 2012 financial results on May 1, 2012.  AC ¶ 26.  These results were "slightly below" analyst consensus estimates for various metrics, including adjusted earnings before interest, taxes, depreciation, and amortization ("Adjusted EBITDA") and adjusted earnings per share ("Adjusted EPS").  AC ¶¶ 8, 26.  After Bankrate released its first quarter 2012

results, analysts reduced their estimates for Bankrate's second quarter results—Adjusted EBITDA estimates were reduced to $37 million from $37.5 million, and Adjusted EPS estimates were reduced to $0.18.  AC ¶ 27.

*Bankrate's Second Quarter Results*

DiMaria, Gamsey, and others on the accounting team saw the first version of Bankrate's second quarter consolidated financial results on July 7, 2012.  AC ¶ 29.  This preliminary version of the results showed an Adjusted EBITDA of $36,144,000 for the second quarter.  *Id.*  On July 11, 2012, DiMaria was informed that second quarter revenue was actually $286,000 lower than previously reported, as the Credit Cards division had accidentally double-counted $286,000.  *Id.* That same day DiMaria directed Bankrate's vice president of finance to book an additional $300,000 in revenue to the Insurance division and an additional $500,000 in revenue to the Credit Cards division.  AC ¶ 30.[2]  The vice president's email instructions to the Insurance and Credit Cards divisions, copying DiMaria, contained "an ambiguous description of what the revenue purportedly related to," and did not specify a legitimate justification for booking the revenue or identify specific customers with which the additional revenue was associated.  AC ¶ 31.

The vice president of finance forwarded the email instructions to Gamsey a few minutes after sending them, and in emails between themselves, Gamsey and the vice president of finance expressed "serious concerns about the validity of the revenue."  AC ¶ 32.  Gamsey wrote:  "F[***] me – seriously – oyyyyyyyyyyyyyy . . . You better make sure that the revenue/margin analytics are thoroughly explained so that we avoid questions on this sh[**]."  *Id.*  In addition, and specifically in

---

[2] The SEC also alleges that the vice president of finance, after being told by DiMaria that Adjusted EBITDA needed to be $37 million, improperly decided to book $99,000 in second quarter accounting fees to the third quarter.  AC ¶¶ 69-73. Although Gamsey was allegedly told of this decision, neither Gamsey nor DiMaria were directly involved in it and because, as explained below, the other facts pleaded by the SEC sufficiently allege scienter, the Court need not devote additional time to this accounting entry at this stage.

response to the directive to the Credit Cards division, Gamsey wrote that he had spoken to DiMaria and

> [DiMaria] said there may be some additional good guy adjustments coming and I f[***]ing knew that he was going to do something like this . . . . We need to be very careful how this gets reflected or be able to have some basis for the estimate to show [the auditor] if they happen to figure it out.

AC ¶ 47.

*Additional Revenue:  Insurance Division*

The Insurance division recorded the $300,000 of additional revenue on July 11, 2012, the same day it was instructed to do so.  AC ¶ 33.  The additional revenue was attributed to a single dormant customer account.  *Id.*  Five days later, when Bankrate's auditor asked Gamsey for an explanation for the $300,000, Gamsey emailed the vice president of finance and said "[b]etter start figuring out an explanation for these."  *Id.*

After the auditor asked about the $300,000 entry, the Insurance division prepared and circulated a draft chart attributing the additional revenue to three different accounting issues related to multiple customers, including revenue from a "clawback" of credits granted to two customers.  AC ¶ 34.  A second draft of the chart substituted estimated revenue from a new bonus provision with a different customer for the "clawback" credits in the first draft, but the items in the chart continued to total approximately $300,000.  AC ¶ 36.  The SEC asserts that these after-the-fact attempts to justify the $300,000 did not comply with generally accepted accounting principles ("GAAP"), and that DiMaria and Gamsey knew, or were reckless in not knowing, that these accounting entries did not comply with GAAP.  AC ¶¶ 38-46.

GAAP compliance aside, neither version of the chart was ever provided to Bankrate's auditor.  Instead, at approximately the same time the first draft of the chart was being circulated internally, Bankrate's vice president of finance sent the auditor a "misleading, generic explanation" that had been approved by DiMaria and Gamsey.  AC ¶ 35.  The explanation provided to the

auditor "implicitly affirmed" that the $300,000 was associated with the single customer account to which it had been booked, rather than the multiple accounts described in the division's charts. *Id.* The auditor did not ask further questions about the $300,000 during its second quarter 2012 review. *Id.*

*Additional Revenue:  Credit Cards Division*

Unlike their more compliant counterparts in the Insurance division, the Credit Cards accountants refused to book the $500,000 of additional revenue ordered by DiMaria. AC ¶ 48. DiMaria responded by telling other Bankrate personnel that he was "going to rip [the Credit Cards CEO's] f[***]ing head off" and fire the Credit Cards accountants if they "f[***] up the accounting." *Id.*  DiMaria also emailed Bankrate's vice president of finance stating that the $500,000 was a "true up of reporting issues," an attempted justification that Gamsey evidently did not credit—after learning of it, Gamsey emailed the vice president of finance saying "Haha – what reporting issues? All the issuers have reporters and I'm sure if we did an analysis there has never been a 'reporting issue' of 500k – maybe 50k.  [DiMaria] is treading on very thin ice here[.]"  AC ¶ 49.

The Credit Cards accountants concluded that they could "possibly" expect an additional $176,000 in June, and recorded that additional revenue for the second quarter.  AC ¶ 50.  On July 12, 2012, after DiMaria learned that Credit Cards had booked $176,000 in additional revenue, he informed Bankrate's vice president of finance that the difference should be booked to Bankrate Core.  AC ¶ 51.  Approximately thirty-five minutes later, the vice president of finance instructed the Bankrate Core accountants to book $305,000 in additional revenue, which they did by doubling the revenue attributable to two of their customers.  *Id.*  The accountants allegedly avoided Bankrate's accounting controls and questions from Bankrate's auditor about the entries by adding the revenue directly to the revenue spreadsheet, rather than through a manual journal entry.  AC ¶ 52.

As with the additional revenue booked by the Insurance division, the SEC alleges that none of the additional revenue booked by Credit Cards and Bankrate Core complied with GAAP, and

that DiMaria and Gamsey knew, or were reckless in not knowing, that. AC ¶¶ 55-57. Each of these improper accounting entries booking additional unsupported revenue was reversed in June 2015, as part of a broader restatement of Bankrate's second quarter 2012 financial results. AC ¶ 6.

*Reduction in Marketing Expense Accrual*

On July 13, 2012, a revised version of Bankrate's consolidated financial results for the second quarter was circulated to DiMaria and Gamsey. AC ¶ 60. This version reflected the additional revenues booked by all three divisions and the resulting Adjusted EBITDA of $36,656,000. *Id.* Shortly after the circulation of the revised financial results, DiMaria directed a Bankrate Core accountant to reduce a marketing accrual account by $400,000, which led to a corresponding reduction in marketing expenses and therefore an increase in quarterly earnings. AC ¶ 61. DiMaria's email to the accountant did not "reference or contain any support" for the reduction in the accrual account, which the SEC alleges was one of Bankrate's "cushion" or "cookie jar reserve" accounts. AC ¶¶ 62, 64.

When Gamsey learned of the reduction in this accrual account, he asked the vice president of finance whether there was a basis for the reduction or whether DiMaria had reduced the accrual account instead of directing additional unsupported revenue entries. AC ¶ 63. Following this $400,000 reduction in accrual, a revised version of Bankrate's financial results, reflecting an Adjusted EBITDA of $37,056,000, was circulated to DiMaria and Gamsey. AC ¶ 66. The SEC alleges that this reduction in the marketing accrual account was later reversed as part of Bankrate's June 2015 restatement of second quarter 2012 financials, and that DiMaria and Gamsey knew, or were reckless in not knowing, that it was improper. AC ¶¶ 65, 67-68.

*Reduction in Management Incentive Plan Accrual*

In addition to the reduction in the marketing accrual account, on the evening of July 13, 2012, DiMaria directed that a reduction of $450,000 be made in an accrual account related to Bankrate's management incentive plan ("MIP"). AC ¶¶ 76-77. The MIP accrual account was one

that DiMaria had used in the past to "tune" Bankrate's numbers.  AC ¶ 78.  After the reduction to

the MIP accrual account, a revised version of Bankrate's financial results reflecting an Adjusted

EBITDA of $37.5 million and an Adjusted EPS of $0.18 was circulated to DiMaria and Gamsey.

AC ¶ 79.  An analysis of Bankrate's second quarter 2012 results as compared to analyst estimates,

sent to DiMaria on July 14, 2012, stated that the analysts' estimated Adjusted EBITDA was

approximately $37.4 million, and Bankrate's Adjusted EBITDA would be approximately $37.5

million.

*Alleged False and Misleading Statements*

On July 31, 2012, Bankrate released its second quarter 2012 financial results.  AC ¶ 82.

Analyst consensus estimates for Bankrate's second quarter were $37.2 million for Adjusted

EBITDA and $0.18 for Adjusted EPS.  *Id.*  In its July 31, 2012 earnings release, Bankrate

prominently featured its Adjusted EBITDA and Adjusted EPS.  AC ¶¶ 83, 86; July 31, 2012

Earnings Release, Exhibit E, ECF No. 43-5.  The SEC alleges that Bankrate's financial results were

materially misstated, in that Bankrate only met the "key" analyst targets for Adjusted EBITDA and

Adjusted EPS because of the improper accounting entries described above.  AC ¶¶ 81-90.

In addition, the SEC alleges that Bankrate misstated its net income in its second quarter

2012 Form 10-Q.  AC ¶ 89.  Bankrate's Form 10-Q reported net income of approximately $16.3

million, but the SEC alleges that Bankrate's net income would have been only $15.5 million had it

not been for the allegedly improper accounting entries.  *Id.*

DiMaria, as Bankrate's CFO, reviewed, approved, and signed the Form 10-Q and announced

Bankrate's financial results during its second quarter 2012 earnings call.  AC ¶ 90.  DiMaria and

Gamsey both signed the second quarter 2012 management letter to Bankrate's auditor, in which they

represented (1) that Bankrate's financial statements were prepared and presented in conformity with

GAAP, (2) that there all material transactions had been properly recorded, and (3) that they had no

knowledge of fraud or suspected fraud that could have materially affected Bankrate's financial

statements.  AC ¶ 91.  Gamsey also orally represented to Bankrate's auditor that he was not aware of any improper or fraudulent accounting practices at Bankrate.  AC ¶ 92.

During the two-week period following Bankrate's announcement of its second quarter 2012 financial results, DiMaria sold 107,177 shares of Bankrate stock for approximately $2 million.  The SEC alleges that the price of his stock was inflated as a result of Defendants' improper accounting practices and misrepresentations.  AC ¶ 94.

On September 8, 2015, the SEC filed this lawsuit against DiMaria and Gamsey, alleging violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").  ECF No 1.  Both defendants moved to dismiss, and on January 22, 2016 the SEC filed its amended complaint.  ECF No. 40.  DiMaria and Gamsey filed their motions to dismiss the amended complaint on February 12, 2016, ECF Nos. 42 and 45, the SEC opposed their motions on March 4, 2016, ECF Nos. 51 and 52, and Defendants filed their replies on March 18, 2016.  ECF Nos. 53 and 56.

## II.      STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), plaintiffs must allege in their complaint facts that, if accepted as true, "state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this plausibility standard, plaintiffs must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged."  *Id.*

Legal conclusions need not be accepted as true, thus "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  "Where a

complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). To avoid dismissal, plaintiffs must "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Federal Rule of Civil Procedure 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Thus, plaintiffs alleging fraud must: (1) "adequately specify the statements [they] claim[ ] were false or misleading"; (2) "give particulars as to the respect in which plaintiff[s] contend[ ] the statements were fraudulent"; (3) "state when and where the statements were made"; and (4) "identify those responsible for the statements." *Lundy v. Catholic Health Sys.*, 711 F.3d 106, 119 (2d Cir. 2013) (quoting *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir. 1989)); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)).

## III.   DISCUSSION

The SEC charges DiMaria and Gamsey with multiple violations of the Securities Act and the Exchange Act. The Court will first address the securities fraud claims, the first five claims for relief in the amended complaint, and will then turn to the various violations of § 13 of the Exchange Act, which are alleged in claims six through twelve.

### A.  Securities Fraud Claims

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78(j)(b). The statute "is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith." *SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 387 (S.D.N.Y. 2014) (quoting *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 249 (S.D.N.Y.

2007)).  Rule 10b-5, the implementing regulation corresponding to § 10(b), provides that it shall be unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"In order to establish primary liability under § 10(b) and Rule 10b-5, a plaintiff is required to prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation . . . or used a fraudulent device." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996).  "The Second Circuit has explained that 'essentially the same elements' are required to prove fraud under Section 17(a) [of the Securities Act] as are required under Section 10(b), 'though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3) [of Section 17.]" *SEC v. Svoboda*, 409 F. Supp. 2d 331, 342 (S.D.N.Y. 2006) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).

Both defendants argue that the accounting entries at issue here are immaterial and that the amended complaint fails to plead facts giving rise to a strong inference of scienter.  In addition, Gamsey argues that because the SEC does not allege that he personally obtained money or property as a result of the purported fraud, the § 17(a)(2) claim against him must be dismissed.

### 1.   Materiality

"A statement or omission is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.'" *IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. The Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) ("*IBEW*") (quoting *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*ECA*")).  In other words, there must be a "substantial likelihood" that

the misstated or omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Id.* at 390.  "On a motion to dismiss, a complaint may not be properly dismissed unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Id.* (internal quotation marks omitted).

The Second Circuit has acknowledged that the SEC's Staff Accounting Bulletin ("SAB") No. 99, "provides that a misstatement related to less than 5% of a financial statement carries the preliminary assumption of immateriality."  *Id.* (citing 64 Fed. Reg. 45150, 45151 (Aug. 19, 1999) ("a numerical threshold, such as 5%, may provide the basis for a preliminary assumption . . .").  But "this 'rule of thumb,' . . . is not conclusive."  *Id.*; *see also Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) (rejecting "exclusive reliance on a single numerical or percentage benchmark to determine materiality").  Courts are required to consider qualitative factors, which "can turn a quantitatively immaterial statement into a material statement."  *IBEW*, 783 F.3d at 391. (citing SAB No. 99 at 45152); *see also* SAB No. 99 at 45151 ("quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality").

Defendants devote several pages of their briefs to descriptions of alternate calculations of the impact of the allegedly false financial information on various metrics—for example, noting that the SEC's approximations yield an alleged misstatement of 4.91% of net income, but that more precise figures lower the percentage to 4.83%, and that the Adjusted EPS was allegedly misstated by only 4.28%.  DiMaria Br. at 19-20.  But as explained above, these numbers are only the starting point in the Court's materiality analysis; "there are numerous circumstances in which misstatements below 5% could well be material."  SAB No. 99 at 45152.

The amended complaint alleges that DiMaria intended to manage earnings and thereby conceal Bankrate's failure to meet analysts' consensus expectations.  These two qualitative factors are highlighted in the SAB as factors that may render relatively smaller misstatements material and

support a finding of materiality at the pleading stage. *See* SAB No. 99 at 45152 ("Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are . . . [w]hether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise"); *Id.* ("[T]he staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earning, are immaterial.").

Defendants' arguments to the contrary are unpersuasive. They contend that Adjusted EBITDA and Adjusted EPS are "a couple of non-GAAP measures" out of "dozens" of metrics available to investors. *See* DiMaria Br. at 21, Gamsey Br. at 9. As such, Defendants contend that these two measures would not have been significant to a reasonable investor, particularly in light of the fact that overall Bankrate reported a turnaround from operating at a loss to operating at a profit. These arguments strike the Court as disingenuous—after all, if these two measures were so insignificant to the reasonable investor, why was DiMaria so focused on them? And why would Bankrate highlight them in the opening paragraphs of its earnings release? *See In re Burlington Coat Factory Sec. Litig,* 114 F.3d 1410, 1420 n.9 (2d Cir. 1997) ("earnings reports are among the pieces of data that investors find most relevant to their investment decisions . . . information about a company's past and current earnings is likely to be highly 'material.'") (citation omitted). At this stage in the litigation the SEC is entitled to have the Court to draw all reasonable inferences in its favor, and on the facts alleged it is reasonable for the Court to conclude that DiMaria and Gamsey—as well as Bankrate, the relevant financial analysts, and investors—viewed these two metrics as significant.

Defendants may ultimately prove, at a later stage in this litigation, that the accounting entries at issue reflect "the simple fact that accrual accounting frequently involves estimates and uncertainties." Gamsey Br. 11. But that possibility does not undermine the Court's conclusion that the allegations in the amended complaint, taken as true, plead deliberate misstatements about the

measures taken to manage Bankrate's Adjusted EBITDA and EPS and hide its failure to meet analyst expectations. The alleged misstatements, if borne out by the evidence, might well have been considered by reasonable investors in deciding how to act, *IBEW*, 783 F.3d at 389, thus the SEC has alleged sufficient facts to plead materiality.

### 2. Scienter

"It is well-settled in this Circuit that a complaint alleging securities fraud must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *Ganino*, 228 F.3d at 168. "Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996). "While the SEC must meet the particularity standard under Rule 9(b), it need not satisfy the pleading requirements under the Private Securities Litigation Reform Act ('PSLRA')." *China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d at 387 (citing *SEC v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008)); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (when determining whether the pleaded facts give rise to a strong inference of scienter in PSLRA claims, a court must take into account plausible opposing inferences).

Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). But because "the relaxation of Rule 9(b)'s specificity requirement for scienter 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations,'" "we require plaintiffs to allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (citations omitted). "The requisite 'strong inference' of fraud may be established either by (a) alleging facts to show that the defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* "[C]onclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b)." *Id.* at 1129.

### i.   The SEC Alleges Scienter with Respect to DiMaria

DiMaria first argues that the SEC has not adequately pleaded facts showing that he had an improper motive.  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *ECA*, 553 F.3d at 198.  The SEC does not dispute this point, but argues that it pleads scienter under the theory of conscious misbehavior.  "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) (en banc)).

Under this theory of scienter, the SEC must allege conduct "which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Id.* (quoting *Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000)).  "[A]n express allegation of deliberate misconduct can be sufficient to plead scienter."  *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 487 (S.D.N.Y. 2007) (citing *Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001)).  Finally, "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 487 (S.D.N.Y. 2007) (quoting *Tellabs, Inc.*, 551 U.S. at 322-23 (emphasis in original).

Here, the SEC has alleged that DiMaria instigated and directed an accounting scheme to ensure that Bankrate met analysts' expectations for the second quarter of 2012.  The amended complaint asserts that upon seeing the first draft of the quarterly financial statements, DiMaria

ordered an additional $800,000 of revenue booked without justification, and that after seeing a later draft he ordered a $400,000 reduction in a marketing accrual account.  Allegedly, DiMaria not only lacked any justification for ordering these accounting entries at the time they were made, but he later approved a "generic, misleading explanation" of the additional Insurance division revenue to be provided to Bankrate's auditor, and claimed that the additional Credit Cards revenue was a true up for "reporting issues"—an explanation that Gamsey found laughable.  The SEC also alleges that DiMaria lashed out against those who thwarted his plan:  when the Credit Cards division resisted booking the additional revenue, DiMaria responded by telling other Bankrate personnel that he was "going to rip [the Credit Cards CEO's] f[***]ing head off" and fire the Credit Cards accountants if they "f[***] up the accounting."  He then turned around and ordered that the revenue that Credit Cards refused to book should be booked instead by Bankrate Core, which promptly booked a baseless $305,000 in additional revenue.  All of those entries were later reversed when Bankrate restated its financials.

DiMaria claims that while some "colorful emails" reflect "frustration and poor communication," DiMaria Br. at 11, he had no reason to believe that any of the revenue ultimately booked was not GAAP-compliant and supported by data available to the division accountants.  He argues that the fact that in some instances the amounts booked were different than the round numbers he directed demonstrates that the accountants only booked revenue that they could properly recognize, and that the worst that can be said is that he "pushed the accountants to find more revenue."  *Id.* at 13.  He suggests that all he meant by his email regarding the Credit Cards accountants was that he "wanted to make sure the accounting was correct."  *Id.* at 11 n.5.

That is one possible explanation for the email and alleged events, and DiMaria will have the opportunity to present his interpretation to a finder of fact later in this litigation.  But at the pleading stage the Court cannot infer, to the SEC's detriment, that DiMaria was merely pushing his

employees to represent Bankrate's performance in the best possible light and had no way of knowing that the subsequent rise in Adjusted EBITDA was unsupported.

Taking the facts in the amended complaint as true and drawing all reasonable inferences in the SEC's favor, the amended complaint alleges a fraudulent scheme orchestrated by DiMaria. The SEC has alleged sufficient facts to show that DiMaria "knew or [was] reckless in not knowing that the accounting . . . at issue was wrong and, therefore, that the financials recognizing the revenue . . . were wrong." *SEC v. Espuelas*, 579 F. Supp. 2d 461, 477 (S.D.N.Y. 2008) (quoting *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 568 (2004)). The facts alleged—the sequence of events in which DiMaria directed multiple unjustified accounting entries until the financial statements reflected the numbers he wanted,[3] DiMaria's *post hoc* and incorrect explanations for those entries, the strongly-worded email after the Credit Cards division refused to obey his instructions, and the allegations that DiMaria had a history of "tuning" Bankrate's numbers to meet targets—combine to support a strong inference that he acted with the requisite scienter under Rule 9(b).

DiMaria's argument that he was entitled to rely on the divisional accountants' explanations for the individual accounting entries at issue ignores the fact that—according to the amended complaint—he ordered the accountants to book the additional revenue in the first place (making it necessary for them to come up with an explanation for doing so), threatened them when they did not follow his instructions, and only stopped directing baseless accounting entries when he was satisfied that Bankrate's financial results would meet analyst estimates. DiMaria's alleged conduct crosses the line from corporate officers' "common practice" of taking "affirmative action to meet revenue, earnings, or profit estimates," *SEC v. Espuelas*, 579 F. Supp. 2d at 474, to consciously, falsely creating the appearance that Bankrate was meeting its targets when he knew that was not the case.

---

[3] The SEC does not contend that the $450,000 reduction in the management incentive plan accrual account was itself improper, and the Court does not rely on that entry in reaching its conclusion.

ii.   *The SEC Alleges Scienter with Respect to Gamsey*

Gamsey also contends that the SEC has failed to plead sufficient facts regarding his actions

to support the strong inference of scienter required to state a claim for liability under Section 10(b).

The Court disagrees.

As with DiMaria, the SEC pleads scienter with respect to Gamsey through allegations of

conscious misbehavior or recklessness.  *Kalnit*, 264 F.3d at 142.  The SEC alleges that Gamsey had

over a decade of experience as a certified public accountant, and that although Gamsey and

Bankrate's vice president of finance discussed the impropriety of particular accounting entries

between themselves, Gamsey helped conceal the entries at issue from Bankrate's auditor.

Specifically, the SEC alleges that Gamsey (1) expressed concern over DiMaria's initial July 11, 2012

instruction to book an additional $800,000 in revenue ("F[***] me – seriously – oyyyyyyyyyyyyyy"),

(2) expressed disbelief that DiMaria would try to justify the requested $500,000 in revenue for the

Credit Cards division as a result of reporting issues ("Haha – what reporting issues? . . . there has

never been a 'reporting issue' of 500k"), (3) and questioned whether the $400,000 in the marketing

accrual account had any basis, or had just been directed instead of additional unsupported revenue

entries.[4]

Gamsey was not only aware of the improper accounting entries, he allegedly worked to

conceal the scheme from Bankrate's auditor.  When the auditors asked for an explanation of the

$300,000 booked by the Insurance division, Gamsey alerted the vice president of finance that he

"[b]etter start figuring out an explanation," and later approved the misleading explanation provided

to the auditor.  When DiMaria told Gamsey that there might be additional "good guy adjustments,"

---

[4] Although not directly related to the improper accounting entries that are the focus of the amended complaint, the allegations that Gamsey was aware that DiMaria caused audit fees to be improperly booked in the first quarter of 2012, and that despite this knowledge Gamsey later told the auditor that the entry had been a "mistake," provide additional support for the inference that Gamsey acted with scienter.

Gamsey told the vice president of finance that they needed to be "careful about how this gets reflected" in case the auditor "happen[s] to figure it out."  Ultimately, Gamsey signed the management representation letter to Bankrate's auditor certifying that Bankrate's financial statements were GAAP compliant, that no material transactions had been improperly recorded, and that he had no knowledge of "fraud or suspected fraud" that "could materially affect the company's financial statements."

Gamsey's alleged experience as an accountant, coupled with his alleged reactions to the specific accounting entries at issue here and his alleged misstatements to Bankrate's auditors give rise to a strong inference of scienter.  *Compare with Espuelas*, 579 F. Supp. 2d at 478-81 (SEC did not allege scienter with respect to executives who were not accounting professionals where the applicable accounting rules were not "straightforward" and the improprieties were not "obvious"); *see also SEC v. Kelly*, 765 F. Supp. 2d 301, 321 (S.D.N.Y. 2011) (genuine issue of material fact with respect to scienter where defendant, a certified public accountant, signed 10-Q, 10-K, and management representation letters stating that company's financial statements were prepared in conformity with GAAP) .

Like DiMaria, Gamsey will have the opportunity to present evidence that he was "diligent and careful" and not "knowingly engaged in fraud," Gamsey Br. 8, as this litigation progresses.

### 3.  Section 17(a)(2)

The amended complaint's fifth claim for relief alleges that both defendants violated § 17(a) of the Securities Act.  For the reasons set forth above, the SEC has pleaded adequate facts to allege violations of §§ 17(a)(1) and (3).  Gamsey argues that the SEC has not alleged a violation of § 17(a)(2) because it claims that Gamsey "obtained money or property for Bankrate," but not for himself.  Section 17(a)(2) of the Securities Act states that "[i]t shall be unlawful for any person in the offer or sale of securities . . . directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact . . . ."  15 U.S.C. §77q.  The courts in this district disagree as to

whether a defendant must personally gain money or property from the fraud in a § 17(a)(2) case, or whether it is sufficient if the defendant obtained money or property on behalf of his employer. *Compare SEC v. Syron*, 934 F. Supp. 2d 609, 637-39 (S.D.N.Y. 2013) (holding that an individual defendant must personally gain money or property from the fraud), *with SEC v. Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012) (concluding that it is sufficient for the SEC to allege that a defendant obtained money or property for his employer while acting as its agent).

The *Stoker* court reasoned that the statute "on its face, does not state that a defendant must obtain the funds personally or directly," and a requirement that the defendant himself obtain the funds would "allow a corporate employee who facilitated a fraud . . . to escape liability for the fraud by reading into the statute a narrowing requirement not found in the statutory language itself." 865 F. Supp. 2d at 463. In contrast, in *Syron*, Judge Sullivan reasoned that there was no need to "resort to purposive analysis" when the text of the statute is itself unambiguous. 934 F. Supp. 2d at 639. This Court agrees with Judge Sullivan's conclusion in *Syron*: "[T]he requirement of personal gain inheres in the word 'obtain.'" *Syron*, 934 F. Supp. 2d at 639. Judge Sullivan's ruling does not read the word "indirectly" out of the statutory text; he acknowledges that the proceeds of the fraud may make their way to the defendant in a "highly roundabout," or indirect, manner. *Id.*; *see also SEC v. Cole*, No. 12-cv-8167-RJS, 2015 WL 5737275 at *7 (S.D.N.Y. Sept. 19, 2015) (the SEC need not show that a defendant received a "fraud bonus" to bring a claim under § 17(a)(2)).

Here, the SEC does not allege any chain of events, however attenuated, that concludes with Gamsey receiving money or property as a result of the alleged scheme. There are no allegations that Gamsey's compensation was increased in any way, or that he owned (or sold) Bankrate stock that increased in value as a result of the alleged misconduct. Because the amended complaint does not allege that Gamsey obtained money or property by means of the alleged misstatements, the § 17(a)(2) claim against him is dismissed without prejudice.

### 4. Aiding and Abetting Securities Fraud

"In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: '(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) "knowledge" of this violation on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.'" *SEC v. Apuzzo*, 689 F.3d 201, 206 (2d Cir. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)). To satisfy the "substantial assistance" element, the SEC must establish that the aider and abettor "in some sort associate[d] himself with the venture, that he participate[d] in it as something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *Id.* (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).

Gamsey argues that the amended complaint's third claim, that, in the alternative, he aided and abetted the Rule 10b-5 violation, must be dismissed because although "a high degree of knowledge may lessen the SEC's burden in proving substantial assistance," *Apuzzo*, 689 F.3d at 215, awareness and approval, without more, do not constitute substantial assistance.[5] As discussed above, the allegations in the amended complaint go beyond awareness and approval.

The amended complaint alleges that Gamsey knew that DiMaria's directives were not supported by accounting principles and would have to be reversed—when he learned that DiMaria had directed Insurance and Credit Cards to book $800,000 in additional revenue he emailed the vice president of finance asking "Doesn't [DiMaria] realize that all this does is put us in a hole to start [the third quarter of 2012] since it will have to be reversed when the 'estimate' is trued up?" When

---

[5] The SEC cites *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618 (S.D.N.Y. 2015), for the proposition that "substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Id.* at 658 (citing *2006 Frank Calandra, Jr. Irrevocable Trust v. Signature Bank Corp.*, 816 F. Supp. 2d 222, 237 (S.D.N.Y. 2011)). But *De Sole* does not provide authority for the SEC's proposition. As an initial matter, both *De Sole* and *2006 Calandra* dealt with fraud claims arising under New York state law, not the federal securities laws, and the standards governing the two are not identical. See *Apuzzo*, 689 F.3d at 215. More importantly, quotation cited in both *De Sole* and *2006 Calandra* is from the portion of *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006), that was not about fraud at all—the Circuit was discussing the standards for aiding and abetting a breach of fiduciary duty.

the Insurance division's additional revenue did raise questions from Bankrate's auditor, Gamsey is alleged to have actively participated in the cover-up, emailing the vice president of finance that he "[b]etter start figuring out an explanation for these," and then reviewing and approving the allegedly misleading explanation that went to the auditor.  Gamsey also signed the second quarter 2012 management representation letter to Bankrate's auditor and orally misrepresented to the auditor that he was not aware of any improper or fraudulent accounting practices at Bankrate.

Although the amended complaint clearly alleges that DiMaria orchestrated the fraudulent scheme, it also alleges that Gamsey was more than just an approving bystander.  The SEC claims that Gamsey asked others to come up with explanations for accounting entries he knew to be improper and lied to the auditor about his knowledge of the improper accounting practices.  Thus, although DiMaria may have been the one pulling the strings, through his alleged actions Gamsey "sought to make [the alleged scheme] succeed."  The SEC has pleaded a claim for aiding and abetting liability against Gamsey.[6]

### 5. Control Person Liability

The SEC has pleaded control person liability against DiMaria, as an alternative theory to primary violations.  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (citing *First Jersey Secs., Inc.*, 101 F.3d at 1472).  DiMaria's only mention of the three counts of control person liability comes in a footnote in which he suggests that he did not have the requisite scienter for control person liability.  Having determined that the SEC has pleaded facts that meet the higher

---

[6] The third claim is also pleaded, in the alternative, against DiMaria, and the ninth and eleventh claims also allege that DiMaria aided and abetted additional violations.  DiMaria's only argument against the aiding and abetting claims is that he did not have the requisite scienter.  As discussed above, the SEC has adequately pleaded scienter and thus his argument fails.

scienter standard for a primary securities fraud violation, DiMaria's argument fails.  The SEC has adequately pleaded control person liability.

### B.  Violations of Section 13 of the Exchange Act

### 1.  Section 13(b)(5) and Rule 13b2-1

Section 13(b)(5) of the Exchange Act provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" of any issuer required to file reports.  15 U.S.C. § 78m(b)(5).  The SEC's sixth claim accuses both DiMaria and Gamsey of violating § 13(b)(5), but Gamsey contends that the amended complaint lacks specific factual allegations describing what he did to violate the Exchange Act.

The SEC alleges that Gamsey expressed concern regarding multiple improper accounting entries.  Instead of alerting the auditor or working to correct the baseless entries, however, he made affirmative misrepresentations to Bankrate's auditor both orally and in writing when he said that he was unaware of any fraud—thus ensuring that the improper entries would be reflected in Bankrate's second quarter financial statements.[7]  In addition, Gamsey advised the vice president of finance to record the additional revenue DiMaria ordered him to book in such a way that Bankrate would "avoid questions," and said that he, Gamsey, and the vice president of finance would "need to be very careful" in how additional adjustments were reflected in case "they happen to figure it out."

These allegations are sufficiently specific to allege a violation of § 13(b)(5), and indeed Gamsey implicitly conceded as much when he failed to address the SEC's arguments on this point in his reply brief.  Gamsey's arguments with respect to the ninth and eleventh claims for relief—which

---

[7] The SEC also points to paragraphs 110 and 134 of the amended complaint, which allege that Gamsey "knowingly circumvented or knowingly failed to implement a system of internal accounting controls to assure that Bankrate's financial statements were prepared in conformity with GAAP."  This is precisely the type of bare legal conclusion that, without more, fails to state a plausible claim.  The claim survives because of the specific factual allegations supporting it.

allege that he aided and abetted Bankrate's violations of §§ 13(a) and (b)(2) of the Exchange Act—

fail for the same reasons.

### 2. Statements to Auditors

The eighth claim for relief alleges that both DiMaria and Gamsey violated Rule 13b2-2,

"which prohibits directors or officers from 'directly or indirectly' making or causing to be made

materially false or misleading statements or omissions to an accountant in connection with filings to

the SEC or other regulatory compliance efforts." *SEC v. Espuelas*, 579 F. Supp. 2d at 487 (quoting

17 C.F.R. § 240.13b2-2).  The SEC is not required to plead scienter to allege a violation of Rule

13b2-2.  *Id.* (citing *SEC v. McNulty*, 137 F.3d 732, 740-41 (2d Cir. 1998)).

Both DiMaria and Gamsey signed the management representation letter which assured

Bankrate's auditors that Bankrate's financial statements had been prepared in conformity with

GAAP, that all material transactions had been properly recorded, and that the signatories had no

knowledge of fraud or suspected fraud that could materially affect the company's financial

statements.  In addition, Gamsey is alleged to have orally misrepresented to the auditor that he was

not aware of any improper or fraudulent accounting practices at the company.

Misstatements in management representation letters, including representations to the effect

that "all frauds had been reported" are sufficient to state a claim for a violation of Rule 13b2-2.

*Espuelas*, 579 F. Supp. 2d at 487; *see also SEC v. Stanard*, No. 06-cv-7736-GEL, 2009 WL 196023 at

*29 (S.D.N.Y. Jan. 27, 2009) (false statements in management representation letters were sufficient

basis for liability under Rule 13b2-2).  With respect to Gamsey's argument that there are no

allegations that the concerns expressed in his emails "had not been resolved to [his] satisfaction" by

the time he made the statements at issue, such a conclusion would require the Court to draw an

inference in Gamsey's favor and against the SEC, and any such inference is inappropriate at this

stage in the litigation.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are granted in part and denied in

part.  The Clerk of Court is directed to terminate the motions pending a Dkt. Nos. 42 and 45.

SO ORDERED.

Dated:  September 14, 2016
New York, New York

_____
GREGORY H. WOODS
United States District Judge